Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows:
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers Compensation Act.
2. The employment relationship existed between the employee and the employer on February 13, 1997.
3. North Carolina Department of Correction was a self-insured employer.
4. The employee was injured in an automobile accident on February 13, 1997.
In addition, the parties stipulated into evidence the following:
1. A notebook containing medical records and reports.
2. A notebook containing discovery responses and Industrial Commission forms.
3. Letter by Ann Porter marked as Defendants Exhibit 1.
4. Student Handbook marked as Defendants Exhibit 2.
5. Attendance Roster marked as Defendants Exhibit 3.
6. Course Description marked as Defendants Exhibit 4.
7. Class schedule marked as Defendants Exhibit 5.
8. Class schedule marked as Defendants Exhibit 6.
9. Map of Sampson County marked as Defendants Exhibit 7.
10. Twenty-one additional pages of medical reports attached to a letter dated June 25, 1999 from Mr. Woltz.
The Pre-Trial Agreement dated May 6, 1999 which was submitted by the parties is incorporated by reference.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner with some modifications and finds as follows:
 FINDINGS OF FACT
1. Plaintiff, who is twenty-six years old and who has completed a number of college course credits, began working for defendant in August 1996 as a correctional officer trainee at Odom Correctional Institution. Her duties included supervising inmates to make sure that they were in the correct location. According to the wage chart submitted by the parties, her average weekly wage was $414.21.
2. Correctional officers were required to complete a four-week basic training program sometime during their first year of employment. During the training, they were taught the necessary skills needed for the position, including search techniques, operation of various firearms, methods for managing and controlling inmates, and prison procedures for dealing with various emergency situations. The training program was taught at the North Carolina Justice Academy in Salemburg, North Carolina, which was located in Sampson County.
3. Plaintiff was notified that she was enrolled to take the training program from January 27 until February 21, 1997. Two other women from her unit were also enrolled in that program, Sarah Valentine and Kim James, and the three women decided to car pool. The academy was approximately two and one-half hours away from their homes, so the trainees were to stay in dormitories on campus during the week, but they were allowed to return home on weekends. Three meals were provided each day at a cafeteria on site at no cost to the trainees. Dinner was served from 5:00 to 6:00 P.M. Unless there was a night class scheduled, the trainees were allowed to leave campus in the evenings, but they were advised that they would not be reimbursed for any meal expenses incurred. Nor were they paid mileage for using their personal vehicles.
4. On February 13, 1997 after completing almost three weeks of the training program, plaintiff and her two co-workers decided to drive to Clinton after classes that day. Ms. James had an unexpected need for feminine hygiene products which were not available on campus. Ms. Valentine had driven her car that week and the women decided to go to a Roses store they knew of in Clinton to get the items Ms. James needed. Clinton was ten to fifteen miles away and, by the time they had finished shopping, it was too late to return to the cafeteria for dinner. Consequently, they drove to a nearby fast food restaurant and ordered food. They then ate in the car as Ms. Valentine drove back to Salemburg.
5. While driving back to the academy, they were involved in a very serious car accident. Ms. Valentine was killed and plaintiff, who was riding in the front passenger seat, was thrown through the windshield. An ambulance was summoned and plaintiff was taken to a nearby hospital. Plaintiff was noted to be unconscious and largely unresponsive, with a Glascow coma scale of five to six. Because of the seriousness of her condition, plaintiff was transported to Cape Fear Valley Medical Center in Fayetteville that day. Dr. Wadon, a neurosurgeon, assumed her care. However, plaintiff was also treated by other physicians at the hospital.
6. Plaintiff was diagnosed with a severe traumatic brain injury, rib fractures, facial lacerations, liver lacerations and a pulmonary contusion. Her facial lacerations were repaired but she otherwise did not require surgery. Plaintiff was comatose on her arrival at the hospital. During the next eight days, she slowly and gradually became responsive. By March 7, 1997 plaintiffs condition was sufficiently improved that she was transferred to the inpatient rehabilitation program at Pitt County Memorial Hospital under the care of Dr. McElligott, a physiatrist at the East Carolina University School of Medicine. Plaintiff remained in the hospital until March 17, 1997. By the time of her discharge, plaintiff was able to eat and ambulate, although she was slow and had some balance problems. She still required supervision for self-care skills and was unable to take care of her child without supervision.
7. Although she was released from the inpatient program, plaintiff continued to attend a comprehensive day treatment program in which she received occupational therapy, speech therapy, physical therapy, recreational therapy and psychology support. By May 1, 1997 Dr. McElligott noted that plaintiff was independent in activities of daily living, child care and light homemaking. However, she complained of shoulder pain and headaches. Dr. McElligott ordered a neuropsychological examination which was performed on July 16, 1997 by Dr. Denney. At the evaluation, plaintiff and her husband reported that her cognitive functioning had improved but that she appeared still to have slower mental speed and problems with comprehension. Plaintiff also complained of being more irritable than before her accident.
8. The neuropsychological tests indicated that plaintiff continued to have some residual impairments resulting from her injury. Her mental speed was impaired, her visuomotor speed was slowed, her higher level abstract reasoning was mildly impaired and she had slightly reduced problem-solving ability.
9. When plaintiff returned to Dr. McElligott on September 11, 1997, she continued to complain of persistent headaches. Because plaintiff was pregnant at the time, Dr. McElligott would only let her take Tylenol. Plaintiff told the doctor that she wanted to return to work for defendant as opposed to pursuing another type of work, so Dr. McElligott advised her that the job would need to be evaluated from a medical standpoint before she would be released to return to work as a correctional officer. Over the next six months, a statement of essential duties for the correctional officer position was provided to the doctor. Although plaintiffs pregnancy was a limiting factor until February when her baby was born, Dr. McElligott was primarily concerned with plaintiffs ability to make quick and appropriate decisions while dealing with prisoners. The concern related to whether plaintiff could correctly read a potentially-dangerous situation, use good judgment, and act appropriately, particularly since she would be armed. Dr. McElligott advised defendant that plaintiff could return to school and finish her training and that she should then work in a control room setting for a period of time to assess her occupational performance before she would be released to return to her regular job without restrictions. The doctor wanted to have a work site assessment performed, but apparently that was not permitted because a prison was involved.
10. Defendant would not allow plaintiff to return to work with the restrictions imposed because the limitations related to essential work functions. Plaintiffs employment was terminated effective January 19, 1999. However, in view of the difficulties she had encountered trying to return to work for defendant, plaintiff had gone to the Department of Vocational Rehabilitation for assistance by that time and was taking college courses so that she could get her degree and work in a health-related field. The evidence did not establish that she had reached maximum medical improvement by the date of hearing before the Deputy Commissioner. Plaintiff remained under the restrictions given by Dr. McElligott, who continued to follow her periodically. Dr. McElligott considered plaintiff to be at a slightly increased risk of having a seizure due to her injury and recommended that she be followed for at least five years after the accident.
11. The fact that plaintiff was thrown through a windshield in a motor vehicle collision on February 13, 1997 was clearly an unusual occurrence which would constitute an injury by accident. Defendant contended that the accident did not arise out of and in the course of her employment. However, at the time of the accident, plaintiff was a traveling employee who was engaged in activities which were reasonable under the circumstances. Even if the shopping at Roses and dinner at the fast food restaurant are considered a personal detour, plaintiff reentered the scope of employment when she began traveling back to the academy campus. When the accident occurred, plaintiff was not engaged in a personal errand which would constitute a distinct departure or deviation from her employment, and her injury was the result of risks associated with traveling, especially in unfamiliar areas.
12. Plaintiff was not engaged in performing her official duties as a correctional officer at the time of the accident. Classes were over for the day and she was in the process of attending to her own physical needs and accompanying co-workers who were also so engaged at the time of the injury.
13. As a result of her injury on February 13, 1997, plaintiff was unable to work in her former capacity as a correctional officer from February 14, 1997 through the date of hearing before the Deputy Commissioner on May 6, 1999, and defendant did not offer work to plaintiff which was suitable to her capacity during that time, which was within the healing period. She had not been able to find alternative employment by May 1999.
14. In that plaintiff was not proven to have reached maximum medical improvement, no findings are made regarding the nature of any permanent partial disability she may sustain as a result of her injury.
 ***********
Based upon the findings of fact and conclusions of law, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On February 13, 1997 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. 97-2 (6); Martin vs.Georgia-Pacific Corp., 5 N.C. App. 37, 167 S.E.2d 790 (1969).
2. Although plaintiff sustained an injury by accident arising out of and in the course of her employment, her injury did not arise out of and in the course of the performance of her official duties as a correctional officer. Consequently, she is not entitled to salary continuation in lieu of workers compensation benefits. N.C. Gen. Stat. 97-143 through 97-166.14.
3. Plaintiff is entitled to compensation for temporary total disability at the rate of $276.14 per week from February 14, 1997 and continuing until she returns to work or until further order of the Commission. N.C. Gen. Stat. 97-29.
4. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident. N.C. Gen. Stat.97-2(19); 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay compensation to plaintiff for temporary total disability at the rate of $276.14 per week from February 14, 1997 and continuing thereafter until she returns to work or until further order of the Commission. That portion of this compensation which has accrued shall be paid in a lump sum. This award is subject to the attorneys fee approved below.
2. Defendant shall pay all medical expenses incurred by plaintiff as a result of this injury by accident.
3. An attorneys fee in the amount of twenty-five percent of the compensation awarded is approved for plaintiffs counsel. Defendant shall pay to plaintiffs counsel a lump sum from the accrued compensation and every fourth check thereafter.
4. Defendant shall pay the costs.
This the ___ day of June, 2000.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/_____________ THOMAS J. BOLCH COMMISSIONER
DISSENTING:
S/_______________ DIANNE C. SELLERS COMMISSIONER
LKM/bjp